Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| G.G., and Y.G., <br><br> Plaintiffs, <br><br> vs. <br><br> CIGNA HEALTH and LIFE INSURANCE COMPANY and the MASSMUTUAL EMPLOYEE WELFARE BENEFITS PLAN, 503, <br><br> Defendants. | COMPLAINT <br><br> Case No. 2:22-cv-00078 - JNP |

Plaintiffs G.G. and Y.G., through their undersigned counsel, complain and allege against

Defendants Cigna Health and Life Insurance Company ("Cigna") and the MassMutual Employee

Welfare Benefits Plan, 503 ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1.  G.G. and Y.G. are natural persons residing in Palm Beach County, Florida. G.G. is

    Y.G.'s father.

2. Cigna is an insurance company headquartered in Bloomfield, Connecticut and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. At all relevant times Cigna acted as agent for the Plan.

4. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). G.G. was a participant in the Plan and Y.G. was a beneficiary of the Plan at all relevant times. G.G. and Y.G. continue to be participants and beneficiaries of the Plan.

5. Y.G. received medical care and treatment at Evoke at Entrada ("Evoke") from October 28, 2019, to February 26, 2020, and Vista Adolescent Treatment Center ("Vista") from February 26, 2020, to December 7, 2020. These are treatment facilities located in Washington County, Utah and Salt Lake County, Utah respectively, which provide sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

6. Cigna denied claims for payment of Y.G.'s medical expenses in connection with his treatment at Evoke and Vista.

7. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

8. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Cigna does extensive business and has offices in Utah, and the treatment at issue took place in Utah. In addition, venue in Utah will save the Plaintiffs costs in litigating this case. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire

that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

9.  The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### Y.G.'s Developmental History and Medical Background

10. Y.G. was given a psychological evaluation during the first grade and was diagnosed with ADHD, Oppositional Defiant Disorder, as well as a high level of impulsivity. Y.G. would often come home crying and worried that he was not like other children. Y.G. was written up by teachers almost daily and was frequently sent to the principal's office. This continued as he grew older.

11. Around the time that he was in the ninth grade, Y.G. started using and selling drugs, primarily vaping materials. He was confronted about this by his parents, but he became adept at hiding his drugs and would often store them at friends' houses. Y.G. sold drugs, primarily as a means to finance his own drug habit. His drug use became a daily occurrence.

12. Y.G. wrote a suicide note in February of 2019 and R.G. immediately took him to a psychologist. The psychologist opined that Y.G. could be safe but would need to be

monitored extremely closely. Y.G. became increasingly combative and expressed interest in leaving home and being placed in foster care.

13. On April 4, 2019, Y.G. was arrested and charged with domestic battery after assaulting his mother and then resisting a police officer. Y.G. was then sent to a juvenile intervention program. Y.G.'s court case advisor opined that Y.G.'s frequent drug use was causing him to become overly aggressive and recommended that he be placed in a residential treatment program.

14. Y.G.'s parents were resistant to this idea and wanted to attempt less intensive interventions first. Later that day however, after leaving the courthouse Y.G. ran away and was found on the train tracks waiting for an opportunity to commit suicide.

15. Y.G. started meeting multiple times a week with a psychologist specializing in the treatment of adolescents with a drug abuse problem. Y.G.'s drug abuse actually increased while he was in treatment and his psychologist recommended that he be placed in a residential program. Y.G.'s parents were again resistant to this idea and he instead was placed in an intensive outpatient program.

16. Y.G. was worried that the court would intervene and send him to a residential program if he did not complete his outpatient treatment, and while he completed the program successfully, he resumed using and selling substances as soon as he finished. Y.G. was expelled from school after being caught smoking in the bathroom and had to start attending another school. Y.G.'s drug use continued unabated and he became increasingly physically and verbally abusive. He would hit his parents and got into a fight with a peer he had scammed during a drug sale.

17. Y.G. then posted videos of him threatening this peer while holding a gun and the police became involved. The school called Y.G.'s parents on October 23, 2019, after he was found wandering the hallways in a drug addled state and was unable to communicate. Y.G. had a severely elevated heartrate and was taken to the emergency room. Before going to the hospital however, Y.G. became belligerent and signed the paperwork to drop out of school.

18. Y.G.'s parents realized that outpatient treatment would not be sufficient to properly address Y.G.'s problems and arranged for a crisis transportation team to take him to Evoke. Y.G. was under the influence of drugs when the team arrived and was unable to comprehend what was happening or where he was going.

**Evoke**

19. Y.G. was admitted to Evoke on October 28, 2019.

20. In a series of Explanation of Benefits ("EOB") statements, Cigna denied payment under code A0: "Your plan booklet lists the services and procedures covered by your plan. The plan will only pay for services listed in the booklet."

21. On October 20, 2020, Y.G.'s mother ("R.G.") submitted an appeal of the denial of Y.G.'s treatment at Evoke. She reminded Cigna that ERISA entitled her to certain protections during the review process including a full, fair, and thorough review which took into account all of the information she provided using appropriately qualified reviewers and which gave her the specific reason(s) for the adverse determination, referenced the specific plan provisions on which the decision was based, and provided her with the information necessary to perfect the claim.

22. R.G. stated that the services provided at Evoke were a covered benefit under the terms of the Plan. She noted that there was no specific exclusion in her insurance policy for outdoor behavioral health services and that the Plan specifically allowed for coverage of mental health services.

23. She wrote that the Plan offered coverage for services performed at an "Other Health Care Facility." She contended that it was nonsensical for Cigna to deny coverage under the grounds that Evoke was a service which was not listed in her benefit booklet when it was a duly licensed and accredited facility which clearly met the Plan's definition for an "Other Health Care Facility."

24. R.G. wrote that Cigna's denial appeared to violate MHPAEA. She stated that MHPAEA compelled insurers to offer coverage for mental health services at parity with comparable medical or surgical benefits.

25. She identified skilled nursing, subacute rehabilitation, and inpatient hospice facilities as some of the medical or surgical analogues to the treatment Y.G. received at Evoke.

26. She contended that Cigna was discriminating against outdoor behavioral health programs by imposing restrictions on facility type and provider specialty in violation of MHPAEA. She requested that Cigna perform a MHPAEA compliance analysis of the Plan and provide her with physical copies of the results of this analysis, as well as any and all documentation used.

27. R.G. encouraged Cigna to contact Dr. Michael Gass, an expert in the field of outdoor behavioral health treatment. She asked Cigna to carefully consider the arguments she had made and to directly respond to the issues she had raised, and to inform her why the

terms of the insurance policy as well as federal law did not appear to apply to Y.G.'s case.

28. In the event Cigna upheld the denial, she asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits she was seeking, any administrative service agreements that existed, any clinical or medical necessity criteria utilized in the determination, as well as their medical or surgical equivalents, regardless of whether these were used to evaluate the claim, as well as any reports or opinions from any physician or other professional who reviewed the claim, along with their names, qualifications, and denial rates. (collectively the "Plan Documents")

29. She asked that in the event Cigna did not possess these documents or was not acting on behalf of the Plan Administrator in this behalf that it forward her request to the appropriate entity.

30. In a letter dated November 17, 2020, Cigna again denied payment for Y.G.'s treatment at Evoke. The reviewer gave the following justification for the denial:

> The clinical basis for this decision is: Based upon review of the available information, coverage for the requested service cannot be approved because there is insufficient scientific evidence to demonstrate the safety and/or effectiveness of Wilderness Therapy Programs. At the present time, per Medical Coverage Policy Complementary and Alternative Medicine (0086), this treatment falls under the category of experimental/investigational/unproven. Your benefit plan does not cover experimental/investigational/unproven services.
>
> Please note that claims for therapeutic services rendered by an independently licensed health care professional for the treatment of a mental health condition and/or substance use disorder while residing at the wilderness program may be submitted for benefit coverage subject to the terms and conditions of the Cigna customer's health plan.

31. On January 22, 2021, R.G. submitted a second appeal for the denial of Y.G.'s treatment at Evoke. She argued that after she had disproven Cigna's initial denial rationale which stated that no coverage was available under the terms of the Plan, Cigna had shifted its denial rationale and now stated that Evoke offered experimental and investigational services.

32. She stated that Cigna had ignored her ERISA requests, including her request for the production of documents, had not addressed her allegations that it was in violation of MHPAEA, and had not attempted to enter into a meaningful dialogue.

33. She again contended that treatment at Evoke was a covered benefit under the terms of the insurance policy. She quoted from Cigna's Complementary and Alternative Medical Coverage Policy 0086 that it had cited to justify the denial of payment and noted that these criteria specifically stated that they were superseded both by the terms of the actual insurance policy as well as any applicable laws.

34. She argued that in any event, Cigna's alternative medicine policy did not apply to Evoke, as outdoor behavioral health programs had been proven and shown to be effective in peer reviewed scientific literature and Evoke was licensed by the appropriate state regulatory authority.

35. She again wrote that Evoke met the Plan's requirements for an "Other Health Care Facility" and was not an excluded service. She included peer reviewed research articles showing that outdoor behavioral health programs were not experimental and investigational and that it was disingenuous to compare them to facilities such as "boot camps" which had no therapeutic value.

36. One of the documents she included was a letter from Dr. Michael Gass which challenged Cigna's criteria directly and stated that these criteria misrepresented outdoor behavioral health services and cherry-picked findings that supported Cigna's position without taking into account other studies.

37. She also included a statement from independent review agency Federal Hearings and Appeal Services, Inc. which stated that outdoor behavioral health treatment was not experimental, had been widely recognized as a viable form of treatment, and had even been assigned its own revenue code from the National Uniform Billing Committee.

38. R.G. again requested to be provided with a copy of the Plan Documents and again instructed Cigna to forward her request to the appropriate entity if it was not acting on behalf of the Plan Administrator in this regard.

39. In a letter dated February 9, 2021, Cigna upheld the denial of payment for Y.G.'s treatment. Although the denial was attributed to a different reviewer, the denial rationale was copy and pasted essentially verbatim from the initial November 17, 2020, denial and did not address any of the arguments R.G. raised in the appeal process or provide her with any of the materials she requested.

**Vista**

40. Y.G. was admitted to Vista on February 26, 2020, on the recommendation of his treatment team at Evoke.

41. In a letter dated February 28, 2020, Cigna denied payment for Y.G.'s treatment at Vista. The letter gave the following justification for the denial:

> We reviewed information from VISTA ADOLESCENT TREATMENT CENTER, your health plan and any policies and guidelines needed to reach this decision. We found the service requested is not medically necessary in your case.

> Based upon the available clinical information, your symptoms do not meet the Cigna Behavioral Health Medical Necessity Criteria for Residential Mental Health Treatment for Children and Adolescents for admission and continued stay from 02/26/2020 forward. You do not have any serious problems with your physical health. You are no longer having thoughts of hurting yourself. You have not been hurting other people. You have been taking your medications as prescribed. You are sleeping and eating normally. You do not have impairments in functioning across multiple settings such as work, home, school, and in the community, that clearly demonstrates a need for 24-hour skilled psychiatric and nursing monitoring and intervention. Less restrictive levels of care are available for safe and effective treatment. (emphasis in original)

42. In a letter dated August 22, 2020, Cigna again denied payment for Y.G.'s treatment at Vista except this time it did so for the intensive outpatient level of care. The letter gave the following justification for the denial:

> Cigna received a request for continued coverage of Intensive Outpatient Mental Health Treatment for Children and Adolescents visits from Vista Adolescent Treatment Center. Because some of the information needed to substantiate Cigna Behavioral Medical Necessity are met was missing, the provider was offered the opportunity to complete a telephonic peer-to-peer review. Unfortunately, the provider did not respond to Cigna's attempts to schedule a peer review, so a determination had to made based on the available information. Based on the available information, you have demonstrated a reported improvement in the symptoms leading to the initial admission, are participating in treatment, and have not indicated or demonstrated risk of harm concerns. Additionally, there is no report you have developed any new symptoms or behaviors that would require this intensity of service for safe and effective treatment. Based on the available information, you have been able to significantly reduce the symptoms that led to this admission, and you are sufficiently stabilized such that you could be safely and effectively treated at a less restrictive level of care. In this situation, the medical necessity criteria are not met so we are unable to approve the request from 7/13/2020 forward. We relied on Cigna Behavioral Medical Necessity Criteria for Intensive Outpatient Mental Health Treatment for Children and Adolescents for this decision.

43. On October 20, 2020, R.G. submitted a level one appeal of the denial of payment for Y.G.'s treatment. R.G. restated her rights under ERISA and reiterated that she was entitled to a full, fair, and thorough review which appropriately addressed her concerns.

She asked to be provided with a physical copy of any and all documentation related to the

appeal decision as well as the initial decision, including any internal reviewer notes.

44. She contended that Cigna's denial violated generally accepted standards of medical

practice. She pointed out that among the reasons Cigna had provided for denying

payment it listed as factors:

- Y.G. does not have any serious problems with his health.
- Y.G. has not been hurting other people.
- Y.G. has been taking his medications as prescribed
- Y.G. is sleeping and eating normally.
- Y.G. does not have impairments in functioning across multiple settings such as work, home, school and in the community.

45. She stated that these were inappropriate metrics to evaluate the medical necessity of

residential treatment care, and not only that, but many of these items were actually

requirements listed not in Cigna's residential treatment criteria, but in its criteria for acute

inpatient hospitalization.

46. R.G. quoted Cigna's criteria for residential treatment care and argued that Y.G. clearly

met these criteria. She argued that if Cigna had properly employed its own criteria rather

than using requirements like Y.G. hurting other people then it would have had no actual

cause to deny payment.

47. R.G. referenced the court decision in *David P. v United Healthcare Ins. Co.,* in which the

court had found that:

> …according to United's level of care guidelines, the criteria that United claims
> reviewers applied in this case are instead the criteria United claims reviewers
> should use when the insured seeks benefits for more intensive, acute-level
> inpatient care in a "structured hospital-based program which provides 24-hour/7-
> day nursing care, medical monitoring, and physician availability. In other words,
> the criteria United claims reviewers applied to deny L.P.'s subacute care at the
> Summit and Uinta residential treatment centers – lack of suicidal ideation, lack of
> violence toward others, lack of serious cognition impairment – are actually the
> same acute criteria that United's Level of Care Guidelines indicate should be

applied to the higher, acute-level mental health care offered in an inpatient hospital setting.

48. R.G. then referenced a second court decision against United, *Wit et.al., v United Behavioral Health* in which the court found United's guidelines violated generally accepted standards of medical practice on several counts, including an overemphasis on acuity of symptoms, and pushing individuals into a lower level of care regardless of whether this treatment was likely to be effective.

49. She stated that while these cases concerned a different insurer, Cigna had engaged in these same practices in the evaluation of Y.G.'s treatment. She asked how she could expect to be provided with a fair review when "the very standard by which my son's treatment is measured is inherently flawed." She asked that Y.G.'s treatment be evaluated using the Plan's definition of medical necessity and generally accepted standards of medical practice rather than flawed proprietary criteria.

50. She contended that Cigna continued to violate MHPAEA through its imposition of treatment limitations on mental health services which it did not equally apply to analogous medical or surgical services.

51. She pointed out that not only did Cigna not use acute level criteria to assess the medical necessity of non-acute medical or surgical services such as skilled nursing facilities, but it appeared not to have any criteria for these services at all. She argued that Cigna could not require mental health services to meet requirements in proprietary criteria when it did not do this for analogous medical or surgical services.

52. R.G. again requested that Cigna perform a parity compliance analysis on the Plan and provide her with a physical copy of the results of this analysis.

53. She noted that Y.G.'s treatment team refused to send him home even on a short visit because they believed it would not be safe, and on one occasion when G.G. visited Y.G., Y.G. stole a bottle of Advil from G.G. and confessed that he intended to overdose on it in an attempt to get high. He gave the bottle back but stated that he regretted it afterwards as he believed it wouldn't have shown up on his drug screen.

54. R.G. included letters of medical necessity as well as a copy of Y.G.'s medical records with the appeal. In a neuropsychological evaluation dated June 21, 2018, conducted by Sharon Miller Ph.D., Y.G. was diagnosed with:

- Cognitive Disorder Not Otherwise Specified
- Attention Deficit Hyperactivity Disorder, Combined Type
- Mild Expressive-Receptive Language Disorder
- Auditory Processing Disorder
- Developmental Motor-Coordination (visual-fine motor)
- Reading Disorder (Reading Comprehension Only)
- Anxiety Disorder Not Otherwise Specified
- Oppositional Defiant Disorder
- R/O Dysthimia

55. In a letter dated November 1, 2019, Dawn Silver, Ph.D., wrote in part:

Dear [R.G.]

This letter is to document the treatment received by your family and son, Mr. [Y.G.], from April 7, 2019 to October 25, 2019. During this time, he participated in weekly individual outpatient psychotherapy with Substance Use Disorder (SUD) education and anger management; and regular random UA analysis. The family also participated in bi-weekly family therapy sessions with similar education also aimed at parenting practices and styles.

Mr. [Y.G.] was diagnosed previously with ADHD (F90.9) and ODD (F91.3); and following the events that led to his receiving treatment at our facility Marijuana use Disorder (F12.20). Additionally, there was a question of a potential mood disorder, but was not diagnosable.

As you know, while in treatment with us, Mr. [Y.G.] was unable to remain sober at an Outpatient level of care; and so was referred to a 6-week local Intensive Outpatient program. However as soon as he was officially discharged from a first-time offender's diversion program with the state, he began to use heavily again

and ended up discharged from two separate schools over a period of a few weeks;
and then hospitalized on 10/21/19 due to SUD.

Parents and this writer concurred that immediate higher level of care treatment
out-of-state was warranted and in patient's best interest at this time.

56. Y.G.'s medical records from Vista showed that he continued to struggle with depression,

anxiety, school performance issues, hopelessness, an inability to cope with emotions,

physical altercations with other students, and cheating in class.

57. R.G. contended that residential treatment was the lowest level of care at which Y.G.

could be safely and effectively treated. She once more requested to be provided with a

copy of the Plan Documents.

58. In a letter dated July 27, 2021, which described itself as a response to 'the appeal

submitted by Vista Adolescent Treatment Center," Cigna upheld the denial of payment

for Y.G.'s treatment. The letter gave the following justification for the denial:

> Based upon my review of the available clinical information received initially and
> with this appeal and the MCG Behavioral Health Guidelines, medical necessity
> was not met for admission at Residential Behavioral Health Level of Care, Child
> or Adolescent, ORG: B-902-RES level of care from 02/26/2020 - 12/31/2021 as
> there was no clear demonstration that you required 24-hour care from skilled staff
> for safe and effective treatment. Although you continued to have intermittent
> problems with mood and motivation, documentation from your stay at the
> previous facility immediately before your admission indicated overall
> improvement in your engagement and participation in care. You did not
> demonstrate serious behavioral problems and were not aggressive toward others.
> There was no objective clinical evidence that you presented a risk of harm to
> yourself or others at the time of admission. You were eating and sleeping
> normally, and there was no evidence of functional impairments. Based upon this
> information, it appears that residential care was not medically necessary for
> continued improvement. Less restrictive levels of care were available for safe and
> effective treatment.

59. Following the denial of payment, R.G. requested that the denial of payment be evaluated

by an external review agency.

60. In a letter dated September 29, 2021, the external review agency upheld the denial of

payment for Y.G.'s treatment. The reviewer gave the following justification for the

denial:

> After review of the clinical records, medical history and physical examinations,
> supporting information, Plan provisions, and relevant guidelines and literature the
> requested Residential Behavioral Health Level of Care, Child or Adolescent,
> ORG: B-902-RES from 02/26/2020 - 12/31/2021 is not medically necessary.

> The requested residential behavioral health level of care, child or adolescent is not
> deemed medically necessary. There is no documentation detailing a level of
> symptom severity warranting residential stay from 2/26/20 through 12/31/21.

> There is a note written in February of 2020, where the claimant expressed suicidal
> ideation however this appears to be an isolated incident while under the care of
> the residential treatment program. There is also documentation of some conflict
> with the family dynamic regarding the claimant and his mother. However, overall
> while in the residential treatment program, the claimant demonstrated leadership
> skills. He attended groups. He was medication compliant. He was able to attend to
> his activities of daily living. He did not have any severe difficulties in cognition
> and memory. The claimant was also able to utilize CBT techniques that he learned
> in group. He was not requiring direct one-to-one care. He was able to process
> information given to him. He was medication compliant and following the rules
> and regulations set forth by the residential treatment program.

61. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan

and ERISA.

62. The denial of benefits for Y.G.'s treatment was a breach of contract and caused G.G. and

R.G. to incur medical expenses that should have been paid by the Plan in an amount

totaling over $280,000.

63. Both Cigna and the Committee failed to produce a copy of the Plan Documents including

any medical necessity criteria for mental health and substance use disorder treatment and

for skilled nursing or rehabilitation facilities in spite of R.G.'s repeated and explicit

requests.

## **FIRST CAUSE OF ACTION**

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

64. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Cigna, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

65. Cigna and the Plan failed to provide coverage for Y.G.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

66. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

67. The denial letters produced by Cigna do little to elucidate whether Cigna conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. Cigna failed to substantively respond to the issues presented in R.G.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

68. In fact, Cigna's November 17, 2020, and February 9, 2021, denial letters are essentially identical to each other and neither attempts to address the arguments R.G. raised in the appeals process. It is also unclear if Cigna responded to R.G.'s October 20, 2020, Vista appeal at all, as its response letter stated it was drafted in response to an appeal submitted by Vista and did not address any of the arguments raised in R.G.'s member appeal letter.

69. Cigna and the agents of the Plan breached their fiduciary duties to Y.G. when they failed

to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act

solely in Y.G.'s interest and for the exclusive purpose of providing benefits to ERISA

participants and beneficiaries, to produce copies of relevant documents and information

to claimants upon request, and to provide a full and fair review of Y.G.'s claims.

70. The actions of Cigna and the Plan in failing to provide coverage for Y.G.'s medically

necessary treatment are a violation of the terms of the Plan and its medical necessity

criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

71. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and

beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply

with both ERISA and MHPAEA is part of Cigna's fiduciary duties.

72. Generally speaking, MHPAEA requires ERISA plans to provide no less generous

coverage for treatment of mental health and substance use disorders than they provide for

treatment of medical/surgical disorders.

73. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health

or substance use disorder benefits that are more restrictive than the predominant

treatment limitations applied to substantially all medical and surgical benefits and also

makes illegal separate treatment limitations that are applicable only with respect to

mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

74. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not

limited to, medical management standards limiting or excluding benefits based on

medical necessity; refusal to pay for higher-cost treatment until it can be shown that a

lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

75.  The medical necessity criteria used by Cigna for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

76.  Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for Y.G.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does Cigna exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

77.  When Cigna and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. Cigna and the Plan evaluated Y.G.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

78. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Cigna's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that Y.G. received. Cigna's improper use of acute inpatient medical necessity criteria is revealed in the statements in Cigna's denial letters such as "There was no objective clinical evidence that you presented a risk of harm to yourself or others at the time of admission."

79. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that Y.G. received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

80. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

81. The Defendants cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

82. Additionally, R.G. alleged that Cigna was imposing limitations on facility type and provider specialty which resulted in a denial, in spite of the fact that she demonstrated

that Evoke was a licensed facility and despite the materials she produced, showing

outdoor behavioral treatment care was proven to be effective in peer reviewed literature.

83. She also pointed out that the National Uniform Billing Committee had assigned a

revenue code for wilderness/outdoor behavioral health treatment. On information and

belief, Cigna does not categorically exclude any comparable medical or surgical

services with such a billing code, and certainly does not do so in "substantially all"

instances, which is the standard necessary to demonstrate MHPAEA compliance.

84. R.G. noted that Cigna restricted the availability of Y.G.'s treatment by forcing it to

comply with requirements contained only within proprietary criteria. R.G. argued that

not only did Cigna exempt comparable medical or surgical services from these

requirements, but it did not appear to have proprietary medical or surgical criteria for

analogous medical/surgical care at all. R.G. requested to be provided with these criteria

if they existed, but Cigna ignored this request.

85. The actions of Cigna and the Plan requiring conditions for coverage that do not align with

medically necessary standards of care for treatment of mental health and substance use

disorders and in requiring accreditation above and beyond the licensing requirements for

state law violate MHPAEA because the Plan does not impose similar restrictions and

coverage limitations on analogous levels of care for treatment of medical and surgical

conditions.

86. In addition, Cigna denied payment for Y.G.'s treatment in part because Y.G. was not

"clearly demonstrate[ing]" a need for active treatment in a 24-hour setting. The

requirement that Y.G. "clearly demonstrate", as opposed to showing by a preponderance

of the evidence available that the treatment Y.G. received was medically necessary,

reveals a significant disparity concerning the documentation required for mental health services versus what is required of comparable medical or surgical services.

87. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Cigna, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

88. Cigna, the Committee, and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that Cigna and the Plan were not in compliance with MHPAEA.

89. The violations of MHPAEA by Cigna and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

WHEREFORE, the Plaintiffs seek relief as follows:

1.     Judgment in the total amount that is owed for Y.G.'s medically necessary treatment at Evoke and Vista under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.     Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3.     Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.     For such further relief as the Court deems just and proper.

DATED this 8th day of February, 2022.

By ____s/ Brian S. King_____
Brian S. King
Attorney for Plaintiffs

County of Plaintiffs' Residence:
Palm Beach County, Florida.